Howard v. IOMAXIS, LLC, 2021 NCBC 82.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

KELLY C. HOWARD and FIFTH
THIRD BANK, NATIONAL
ASSOCIATION, AS CO-TRUSTEES
OF THE RONALD E. HOWARD
REVOCABLE TRUST U/A DATED
FEBRUARY 9, 2016, AS AMENDED
AND RESTATED,

Plaintiffs,

v.

IOMAXIS, LLC; BRAD C. BOOR a/k/a
BRAD C. BUHR; JOHN SPADE, JR.;
WILLIAM P. GRIFFIN, III; and
NICHOLAS HURYSH, JR.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 11679

**ORDER AND OPINION ON MOTIONS
TO AMEND**

1.     THIS MATTER is before the Court on Plaintiffs Kelly C. Howard and Fifth Third Bank, National Association's ("Plaintiffs") Motion for Leave to File First Amended Complaint ("Plaintiffs' Motion to Amend"), (ECF No. 118), and Defendant Nicholas Hurysh, Jr.'s ("Hurysh") Motion for Leave to Amend and Supplement Answer and to Add Cross-Claims and Third-Party Claims ("Hurysh's Motion to Amend"; together, the "Motions"), (ECF No. 96).

2.     Plaintiffs seek leave to amend their Complaint to add two claims for fraud, as well as claims for violation of the Uniform Voidable Transactions Act ("UVTA"), for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), and for imposition of a constructive trust.  (Proposed First Am. Compl. ¶¶ 193–230 [hereinafter "Pls.' Proposed Am."], ECF No. 118.2.)  Plaintiffs also

request leave to add three new defendants: Robert A. Burleson ("Burleson"), Fast Rabbit, LLC ("Fast Rabbit"), and Global Vector, LLC ("Global Vector"). (Pls.' Proposed Am. ¶¶ 98, 100, 102.)

3. Separately, Hurysh's Motion to Amend seeks leave to add thirteen new and different claims as follows: (i) breach of common law and statutory fiduciary duties; (ii) a claim for a mandatory and prohibitory injunction; (iii) conversion; (iv) a claim based on *Meiselman v. Meiselman*, 309 N.C. 279 (1983); (v) defamation; (vi) constructive trust and accounting; (vii) constructive fraud (fraud in the inducement); (viii) right to distributions; (ix) a claim under UDTPA; (x) derivative claims on behalf of IOMAXIS, Fast Rabbit, and Global Vector; (xi) unjust enrichment; (xii) a claim for declaratory relief; and (xiii) a claim for piercing the corporate veil. (*See* Proposed Am. Answer, Cross-Claims, & Third-Party Compl. ¶¶ 106–205 [hereinafter "Hurysh's Proposed Am."], ECF No. 96.1.) Hurysh seeks to add Fast Rabbit and Global Vector as third-party defendants in this matter. (Hurysh's Proposed Am. ¶¶ 2–3.)

4. Having considered the Motions, the related briefing, the arguments of counsel at the hearing on the Motions, and other matters of record, the Court, in the exercise of its discretion, hereby **GRANTS in part** and **DENIES in part** each Motion.

*Johnston, Allison & Hord, P.A., by Greg C. Ahlum, Parker E. Moore, David T. Lewis, and Lauren S. Martin, for Plaintiff Kelly Howard, as co-Trustee of the Ronald E. Howard Revocable Trust u/a dated February 9, 2016, as Amended and Restated.*

*Womble Bond Dickinson (US) LLP, by Lawrence A. Moye, and Loper Law, PLLC, by Johnny M. Loper, for Plaintiff Fifth-Third Bank, NA, as*

*co-Trustee of the Ronald E. Howard Revocable Trust u/a dated February 9, 2016, as Amended and Restated.*

*Nelson Mullins Riley & Scarborough LLP, by Benjamin S. Chesson, David Allen, Anna Majestro, and Travis Bustamante, for Defendants IOMAXIS, LLC, Brad C. Boor a/k/a Brad C. Buhr, John Spade, Jr., and William P. Griffin, III.*

*Miller Monroe & Plyer, PLLC, by Jason A. Miller, Paul T. Flick, and Robert B. Rader, III, for Defendant Nicholas Hurysh, Jr.*

Earp, Judge.

## I.      INTRODUCTION

## The Recorded Telephone Conference Calls

5.      On the morning of 13 July 2021, one day before a hearing scheduled on the Motions,[1] counsel for Defendants IOMAXIS, LLC ("IOMAXIS"), Brad C. Boor a/k/a Brad C. Buhr ("Buhr"), John Spade, Jr. ("Spade"), and William P. Griffin, III ("Griffin"; together, the "IOMAXIS Defendants") notified the Court via e-mail that a transcript of a 22 July 2020 telephone conversation existed and that Defendant Hurysh intended to file it with respect to another planned motion, this one for sanctions.[2] The IOMAXIS Defendants objected on the ground that the transcript was protected by the attorney-client privilege.  The Court determined to move forward with the hearing on the pending motions but not to permit use of the transcript absent further review.

---

[1] Although Plaintiff's Motion to Appoint a Receiver, (ECF No. 106), and Motion to Compel, (ECF No. 100), were also scheduled to be heard, they were continued during the hearing.

[2] As of the date of this Order and Opinion, Hurysh has not filed a motion for sanctions.

6. All parties appeared on 14 July 2021 and were heard on Plaintiffs' Motion to Amend and Hurysh's Motion to Amend. The Court did not permit argument on the content of any recorded telephone conference.

7. Subsequent to the hearing, on 3 August 2021, Hurysh filed a Motion for *In Camera* Inspection and for Leave to File Affidavits, Recordings and Transcripts Under Seal (the "Motion for Leave"), (ECF No. 156), describing the content of *two* recorded telephone calls, the previously identified telephone call which occurred on 22 July 2020 (the "July 22 Call"), and a second, earlier telephone call on 17 July 2020 (the "July 17 Call"). Hurysh acknowledged that the IOMAXIS Defendants had asserted that the attorney-client privilege protected the recordings and related materials from disclosure. The IOMAXIS Defendants filed a Motion for Protective Order shortly thereafter. (*See* Interim Ord. Regarding Tr. 17 July 2020 Call ¶ 4 [hereinafter "Interim Ord."], ECF No. 175.)

8. Following a referral to The Honorable Michael L. Robinson to conduct an *in camera* review, briefing, and a hearing on the IOMAXIS Defendants' Motion for Protective Order, the Court entered an Interim Order on 15 November 2021 documenting that no objection had been made by the IOMAXIS Defendants to disclosure of one of the transcripts, that of the July 17 Call, on the basis of the attorney-client privilege or on any other legal principle. (Interim Order ¶ 12.)[3]

---

[3] In addition, on 3 December 2021, Judge Robinson issued a second Order determining that Hurysh could disclose the July 22 Call transcript. (Sealing Ord. Regarding Entry Ord. IOMAXIS's Mot. Protective Ord. ¶ 3, ECF No. 176.) On 9 December 2021, the IOMAXIS Defendants appealed Judge Robinson's Order with respect only to the July 22 Call. (Not. Appeal, ECF No. 181.) The undersigned has not reviewed and does not consider the July 22

9.    The Court thereafter granted Hurysh's Motion for Leave to file the July 17 Call transcript (and related materials) under seal, and on 16 December 2021, Plaintiffs provisionally filed a copy of the July 17 Call transcript.  (ECF No. 186.2 (under seal).)  In response to an objection from the IOMAXIS Defendants, the Court permitted further briefing as to the effect of the July 17 Call transcript, if any, on the current Motions to Amend.  (ECF Nos. 180, 184.)  Plaintiff filed a supplemental brief contending, *inter alia*, that a determination of the pending Motions to Amend does not depend on the July 17 Call.  (Pls.' Suppl. Br. 7, ECF No. 186 (under seal).)  The IOMAXIS Defendants also filed a supplemental brief and argue that the July 17 Call transcript does not impact the instant Motions.  (Defs.' Suppl. Br. 1, ECF 188 (under seal).)

10.    The Court, having considered the Motions, the proposed amendments, the briefs and affidavits filed by the parties (with the exception of paragraph 80 of Hurysh's first affidavit, ECF No. 97, and paragraph 15 of Hurysh's second affidavit, ECF No. 109.1, both of which pertain to the July 22 Call), the 17 July 2020 transcript of recorded telephone call, the supplemental submissions, the arguments of counsel at the hearing, and other relevant matters of record, concludes, in its discretion, that Hurysh's Motion is **GRANTED** to the extent he seeks to amend his responses and defenses to Plaintiffs' Complaint, but **DENIED** to the extent he seeks to add new

Call with respect to the current Motions; consequently, a determination of the Motions is not affected by that appeal.  *See* N.C.G.S. § 1-294 ("When an appeal is perfected. . . it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein, unless otherwise provided by the Rules of Appellate Procedure; *but the court below may proceed upon any other matter included in the action and not affected by the judgment appealed from*." (emphasis added)).

allegations, cross-claims, and third-party claims. Plaintiffs' Motion to Amend is **GRANTED in part** and **DENIED in part** as explained below.

## II. FACTUAL AND PROCEDURAL BACKGROUND

11. This case arises from a dispute regarding Plaintiffs' rights as economic interest holders of a 51% interest in IOMAXIS. (*See, e.g.*, Compl. ¶ 84, ECF No. 3.) Ronald E. Howard ("Howard" or "Decedent Howard") originally owned the 51% interest (the "Howard Interest"), which passed to his Estate at the time of his death in June 2017 before being transferred to a trust in December 2017. Plaintiffs are co-trustees of this trust. Defendants are IOMAXIS and individuals with an interest in IOMAXIS that may be affected by this action. (Compl. ¶¶ 1–5, 14; *see* Ord. & Opinion Pls.' Joint Mot. Enforce Mem. Settlement ¶ 6 [hereinafter "Ord. & Op. Mot. Enforce"], ECF No. 70 (describing the factual background of this case).)

12. Plaintiffs' original Complaint, filed on 18 June 2018, asserts a claim for declaratory judgment with respect to the purported conversion of the North Carolina limited liability company to a Texas limited liability company, the operating agreement that controls, and their entitlement to distributions. Plaintiffs also assert claims for breach of the right to receive interim distributions and for an accounting to receive from Defendants "the requested business, financial and valuation information of IOMAXIS." (Compl. ¶¶ 71–97.) Among other things, Plaintiffs allege that they are entitled to receive sufficient financial information regarding the value of their interest in IOMAXIS at the time of Howard's death to enable them to satisfy federal estate tax obligations with respect to that interest. (*See, e.g.*, Compl. ¶ 92.)

13. Defendants maintain that Plaintiffs' entitlement to distributions and inspection of IOMAXIS's records turns on which operating agreement controls Plaintiffs' economic interest. (*See, e.g.*, Defs.' Br. Resp. Pls.' Mot. Amend 3 [hereinafter "Defs.' Br. Opp'n Pls.' Mot."], ECF No. 125.) They further contend that, in any event, they have already provided sufficient information for Plaintiffs to value their interest in IOMAXIS for estate tax purposes. (*See, e.g.*, Defs.' Br. Supp. Mot. Compel IOMAXIS USA Valuation Report 2 [hereinafter "Defs.' Br. Supp. Mot. Compel"], ECF No. 123.)

14. Hurysh was employed by IOMAXIS as a network engineer prior to his discharge from employment on 16 September 2020. (Hurysh Aff. ¶¶ 5, 102.) He was also a member of IOMAXIS, Fast Rabbit, and Global Vector. (Hurysh Aff. ¶¶ 40, 43, 47.)

15. Over the more than three years that this case has been pending, the parties have engaged in significant discovery. The process has not been without substantial controversy, however. For example, the IOMAXIS Defendants have refused to provide discovery related to Fast Rabbit or other entities because they contend that doing so would require disclosure of classified information. (*See, e.g.*, Pls.' Br. Supp. Mot. Compel 2, ECF No. 101; Dep. IOMAXIS, LLC 38:21–39:7, ECF No. 101.2; Hurysh Aff. ¶ 88.)

16. According to IOMAXIS, it has already produced more than 16,000 pages of documents in response to Plaintiffs' various requests. (Defs.' Br. Supp. Mot. Compel 2.) But Plaintiffs have raised questions regarding the authenticity and

accuracy of at least some of the financial information produced, (*see, e.g.*, Pls.' Mot. Compel, ECF No. 151 (seeking a forensic copy of source data to confirm information previously provided by Defendants)), and they argue that they have yet to receive financial information regarding the distributions they allege are owed to them, (*see, e.g.*, Pls.' Br. Supp. Mot. Compel 3–4, ECF No. 153 (requesting discovery originally sought in August 2018)).

17. Indeed, addressing discovery issues has been the subject of multiple disputes and conferences with the Court. (*See, e.g.*, ECF Nos. 147, 149.) The Court has extended the deadlines in this case several times in four Case Management Orders. (*See* ECF Nos. 35, 38, 48, 71.)

18. The parties have also engaged in settlement discussions and related motion practice that have delayed the progress of this case. In September 2019, the parties were in the process of taking discovery depositions when they engaged in an impromptu settlement discussion, resulting in a memorandum of settlement. Unfortunately, however, the settlement was never consummated. (*See generally* Ord. & Op. Mot. Enforce.) This Court heard and addressed Plaintiffs' Joint Motion to Enforce the Settlement Agreement on 10 December 2019 and issued its Order and Opinion on 1 May 2020, denying enforcement of the memorandum of settlement. (*See* Ord. & Op. Mot. Enforce.)

19. The Court then entered its fifth Case Management Order in which it provided that "[t]he parties may file motions to amend pleadings and/or add parties so long as such motion(s) are filed prior to the expiration of the fact discovery deadline

set forth herein" and that "[o]bjections to any such motion(s) must be filed within fourteen (14) calendar days of such motion's filing and said objections may be based on any grounds except that of undue delay." (Fourth Am. Case Management Ord., at ¶ IV(B)(3), ECF No. 71.)

20. Soon thereafter, Defendants and Hurysh experienced changes in counsel (*See* ECF Nos. 76, 95). In response to this activity, the Court stayed discovery in October 2020. (Scheduling Ord., ECF No. 78.)

21. Since the October 2020 stay, Hurysh has broken ranks with his fellow defendants and filed his first affidavit discussed below, as well as his Motion to Amend now before the Court. Plaintiffs followed suit with their own Motion to Amend. The discovery stay has remained in place pending resolution of these Motions.

### A. Hurysh's Affidavit

22. Hurysh filed his Motion to Amend in December 2020 along with a lengthy affidavit (the "Hurysh Affidavit") in which he testified that, among other things, Buhr has misappropriated funds from IOMAXIS using separate entities, including the company Fast Rabbit, to pay for extravagant personal expenses. (*See* Hurysh Aff. ¶¶ 49–50 ("Buhr used Fast Rabbit to siphon funds out of IOMAXIS . . . by setting up loans from IOMAXIS to Fast Rabbit and then 'repaying' these loans by adding substantial mark-ups to vendor invoices and then passing them through to IOMAXIS for payment.").)

23.     According to Hurysh, Fast Rabbit, which has since been dissolved,[4] was formed by Buhr in 2013 as a "shell company" that served as "an intermediary, pass-through entity between IOMAXIS and its vendors." (Hurysh Aff. ¶¶ 47–48.) Hurysh claims that Fast Rabbit "did not have a separate operational existence from IOMAXIS." (Hurysh Aff. ¶ 48.) It shared common ownership with IOMAXIS in that Defendants Buhr, Griffin, and Hurysh himself constituted its members. (Pls.' Proposed Am. Ex. N; *see* Hurysh Aff. ¶¶ 47, 52.)

24.     Hurysh also suggested in his affidavit that Defendants created Global Vector, now dissolved,[5] to divert IOMAXIS funds. (*See* Hurysh Aff. ¶ 100.) According to Hurysh, Global Vector is "a shell company that Mr. Buhr formed to serve as an unclassified, subcontractor of [IOMAXIS] that would serve as an intermediary, pass-through entity between [IOMAXIS] and its vendors." (Hurysh Aff. ¶ 44.) Global Vector also shared ownership with IOMAXIS in that Buhr and Hurysh, among others, were members. (*See* Hurysh Aff. ¶¶ 43–46; Pls.' Proposed Am. ¶ 176.) Given their overlapping ownership, Plaintiffs allege that Fast Rabbit and Global Vector are IOMAXIS "affiliates." (*See* Pls.' Proposed Am. ¶¶ 133–35.)

25.     Hurysh's affidavit details Buhr's alleged scheme to misappropriate IOMAXIS funds through Fast Rabbit, Global Vector, and other entities. He attests that in June 2020, Buhr established a plan to create yet another new company

---

[4] Hurysh claims that Fast Rabbit was dissolved at some point without corporate authority or Hurysh's consent. (Hurysh Aff. ¶ 53.)

[5] According to Hurysh, Global Vector was improperly dissolved in 2015. (*See* Hurysh Aff. ¶¶ 45–46.)

through which to misappropriate funds. (Hurysh Aff. ¶ 79; *see also* Hurysh's Proposed Am. ¶ 46.)

26. Also detailed in Hurysh's affidavit is a purported loan of approximately $1.5 million that Buhr "unilaterally structured" from IOMAXIS to Fast Rabbit in December 2013 (the "December 2013 Loan"). (Hurysh Aff. ¶ 64.) Hurysh testified that Buhr "indicated that this payment would be structured as a loan to the outside world, but that the owners would not have to pay it back." (Hurysh Aff. ¶ 64.) Rather, the December 2013 Loan would be paid back using "bonuses, increased salaries, and other methods[.]" (Hurysh Aff. ¶ 64.)

27. In addition to being a member of IOMAXIS, Hurysh served as IOMAXIS's network engineer during this time. (Hurysh Aff. ¶ 5.) As a member and employee, Hurysh states that he "participated in strategic planning and performed other mission critical tasks for [IOMAXIS] . . ., including what he expected and thought to be a meaningful role in management." (Hurysh's Proposed Am. ¶ 8; *see also* Hurysh Aff. ¶ 101.)

28. Furthermore, as a member of Fast Rabbit, Hurysh admits that he received "approximately $400,000.00" from the December 2013 Loan. (Hurysh Aff. ¶ 64; *see also* Hurysh's Proposed Am. ¶ 37.)

29. Much of the Hurysh Affidavit describes wrongs personal to him, including the following: that he was forced to sign an Equity Purchase Agreement that Buhr misrepresented to him, (Hurysh Aff. ¶¶ 37–38); that joint defense counsel represented the parties under a conflict of interest, (Hurysh Aff. ¶ 95); that the other

defendants caused him to be terminated and victimized him with acts of retaliation for his legal position, (Hurysh Aff. ¶¶ 97–102); that he has been defamed, (Hurysh Aff. ¶ 104); that IOMAXIS has improperly assigned him legal expenses, (Hurysh Aff. ¶ 106); that separate lawsuits filed by IOMAXIS against him in Virginia and Maryland are baseless and retaliatory, (Hurysh Aff. ¶¶ 110–11); that application of a 2020 Operating Agreement as to his interest in IOMAXIS is improper, (Hurysh Aff. ¶¶ 84–85); and that entity records have been concealed from him despite his membership status in all three entities, (Hurysh Aff. ¶¶ 54, 108).

30.     Hurysh further alleges that that he has not received the distributions to which he is entitled as a member of one or more companies, (Hurysh's Proposed Am. ¶ 158), that the other IOMAXIS members owe him a fiduciary duty that they have breached, (Hurysh's Proposed Am. ¶ 111), and that he is entitled to a *pro rata* portion of Decedent Howard's membership interest upon redemption, (Hurysh's Proposed Am. ¶ 163).

### B.     The Motions to Amend

31.     On 15 September 2020, Hurysh, through counsel, made a derivative demand on IOMAXIS, Fast Rabbit, and Global Vector. (Hurysh Aff. ¶ 100.) Hurysh brought his Motion when the demand period expired in December 2020, in order to pursue allegations of wrongdoing that he attributes primarily, but not solely, to Buhr. (*See generally* Def. Hurysh's Mem. L. Supp. Hurysh's Mot. Amend [hereinafter "Hurysh Br. Supp. Mot. Amend"], ECF No. 98.) Specifically, Hurysh seeks to incorporate the theory set forth in his affidavit that Buhr has diverted IOMAXIS

funds in the past and, that in the summer of 2020, Buhr devised a plan to continue to divert funds. Hurysh's Motion also seeks to amend his answers to the allegations in Plaintiffs' Complaint and to state new theories of liability involving Fast Rabbit and Global Vector. (*See generally* Hurysh's Proposed Am.)

32. Even though they had spotted transactions in the records produced by IOMAXIS that prompted questions during the North Carolina Rule of Civil Procedure 30(b)(6) deposition of IOMAXIS in September 2019, Plaintiffs state that they did not "connect the dots" and were not aware of the alleged wrongdoing outlined in Hurysh's affidavit until 23 December 2020, when the affidavit was filed. (*See* Pls.' Reply Br. Further Supp. Mot. Leave File First Am. Compl. 1, ECF No. 131 ("Plaintiffs move[ ] to add new claims and new parties based on evidence first brought into light by Defendant Hurysh.").) Once aware, Plaintiffs filed their Motion to add claims against the original Defendants, as well as Fast Rabbit, Global Vector, and Burleson[6] based on Hurysh's allegations that the IOMAXIS Defendants siphoned funds out of IOMAXIS for their personal benefit and excluded Plaintiffs from receiving funds that should have been distributed to them. (*See generally* Br. Supp. Pls.' Mot. Leave File First Am. Compl., ECF No. 119.)

33. Defendants IOMAXIS, Buhr, Spade, and Griffin oppose both Motions. (*See* Defs.' Br. Opp'n Pls.' Mot.; Defs.' Br. Resp. Mot. Amend [hereinafter "Defs.' Br. Opp'n Hurysh's Mot."], ECF No. 108.)

---

[6] Burleson is alleged to either be or have been "a member/manager of IOMAXIS." (Pls.' Proposed Am. ¶ 98.)

## III.    LEGAL STANDARD

34.    Rule 15(a) of the North Carolina Rules of Civil Procedure ("Rule(s)") provides that leave to amend "shall be freely given when justice so requires." N.C. R. Civ. P. 15(a). "Reasons justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5) repeated failure to cure defects by previous amendments." *Window World of St. Louis, Inc. v. Window World, Inc.*, 2015 NCBC LEXIS 79, at *18 (N.C. Super. Ct. Aug. 10, 2015) (citing *Martin v. Hare*, 78 N.C. App. 358, 361 (1985)).

35.    The Supreme Court of North Carolina has opined that "[t]here is no more liberal canon in the rules than that leave to amend 'shall be freely given when justice so requires.' " *Duke Energy Carolinas, LLC v. AG Ins. SA/NV*, 2019 NCBC LEXIS 105, at *4 (N.C. Super. Ct. Dec. 10, 2019) (quoting *Vaughan v. Mashburn*, 371 N.C. 428, 434 (2018)). "Rule 15 encourages trial courts to permit amendment liberally and evinces our State's 'general policy of allowing an action to proceed to a determination on the merits.' " *Id.* (quoting *House of Raeford Farms, Inc. v. Raeford*, 104 N.C. App. 280, 282 (1991)).

36.    Still, the right to amend pursuant to Rule 15 is not unfettered. *See e.g.*, *Vaughan*, 371 N.C. at 433 ("[A]mendments should be freely allowed unless some material prejudice to the other party is demonstrated." (quoting *Mauney v. Morris*, 316 N.C. 67, 72 (1986))). "The burden is upon the opposing party to establish that that party would be prejudiced by the amendment." *Mauney*, 316 N.C. at 72.

37.     Furthermore, Rule 15(d) provides that the court may, "upon reasonable notice and upon such terms as are just, permit [a party] to serve a supplemental pleading setting forth transactions or occurrences or events which may have happened since the date of the pleading sought to be supplemented[.]"  N.C. R. Civ. P. 15(d).  "[T]he standards used . . . in ruling on a motion to amend or on a motion to supplement are nearly identical."  *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002); *see, e.g.*, *Turner v. Duke Univ.*, 325 N.C. 152, 164 (1989) (looking to federal law for interpretive guidance for the North Carolina Rules of Civil Procedure).

38.     "Ultimately, whether to allow an amendment rests in the trial judge's discretion."  *KRG New Hill Place, LLC v. Springs Inv'rs, LLC*, 2015 NCBC LEXIS 20, at *8 (N.C. Super. Ct. Feb. 27, 2015) (citing *House of Raeford Farms, Inc.*, 104 N.C. App. at 282); *see also Pender Farm Dev., LLC v. NDCO, LLC*, 2020 NCBC LEXIS 110, at *19 (N.C. Super. Ct. Sept. 25, 2020) ("Whether to grant or deny a Rule 15(d) motion is a decision that lies within the trial court's sound discretion.").

39.     With these rules in mind, the Court now turns to each Motion, beginning with Plaintiffs' Motion.

## IV.     ANALYSIS

### A.     Plaintiffs' Motion to Amend

40.     Plaintiff seeks to assert five new claims variously against the existing Defendants and three new parties: Fast Rabbit, Global Vector, and Burleson.  The new claims are: (i) fraud against the existing Defendants, including Hurysh and the new parties, based on the December 2013 Loan between IOMAXIS and Fast Rabbit

to allegedly fund personal expenditures; (ii) fraud against the existing Defendants and Burleson (but not Hurysh) based on a scheme to transfer funds out of IOMAXIS and into "shell" companies; (iii) violation of both the UVTA and (iv) the UDTPA against the existing Defendants, Fast Rabbit, Global Vector, and Burleson (but not Hurysh) based on an alleged scheme to transfer funds out of IOMAXIS and into other companies; and (v) a request for a constructive trust to preserve the assets acquired through misconduct. (Pls.' Proposed Am. ¶¶ 193–230.)

41.     The Court now considers each of Plaintiffs' proposed claims in turn.

### 1. **Fraud Based on the December 2013 Loan**

42.     In the first fraud claim against all Defendants, including Hurysh and new parties Burleson, Fast Rabbit, and Global Vector, Plaintiffs allege that Buhr and IOMAXIS represented to Decedent Howard that the December 2013 loan "was being made by IOMAXIS for one or more legitimate business purposes" when, in reality, the monies were used "in a clandestine fashion" to fund the personal expenditures of some of the members. (Pls.' Proposed Am. ¶¶ 194–95.)[7] Plaintiffs allege that "IOMAXIS and Defendant Buhr agreed to 'loan' money to entities in which Decedent Howard held no interest so that other members of IOMAXIS . . . could use such funds for their personal benefit." (Pls.' Proposed Am. ¶ 197.)

_____

[7] However, somewhat inconsistently, Plaintiffs also allege that IOMAXIS concealed the loan from Decedent Howard and, subsequently, from Plaintiffs. (Pls.' Proposed Am. ¶ 130.) Nevertheless, at the hearing, Plaintiffs' counsel clarified that the fraud alleged is one of concealment rather than affirmative misrepresentation. (July 14, 2021 Hr'g Tr. 123:20–23 [hereinafter "Tr."], ECF No. 191 (clarifying that the fraud claims involve fraudulent concealment).)

43. The Court first notes that this claim involves allegedly fraudulent conduct that occurred prior to the assignment of the Howard Interest to Plaintiffs—while Howard was still alive and a member of IOMAXIS. Indeed, Plaintiffs have labeled their cause of action as "Fraud – Fast Rabbit and Global Vector," both of which are dissolved, and, at least with respect to Global Vector, was dissolved before Howard's death. (*See* Pls.' Proposed Am., at "Fourth Claim for Relief.") Thus, for Plaintiffs to have standing to assert claims for any fraud that occurred during Howard's life, the claim must have passed from Howard to his Estate and thereafter been properly assigned by the Estate to Plaintiffs.

44. There is no allegation that Decedent Howard discovered the alleged fraud during his lifetime. To be sure, Plaintiffs argue that the claim did not accrue until it was discovered more than three years after Decedent Howard's passing. The parties do not address the timing of this discovery on the viability of the claim. Clearly, however, the Estate cannot assign a claim it does not possess. *Hurst v. West*, 49 N.C. App. 598, 606 (1980) (stating that an assignee can "take by transfer only what rights and interests the assignor had at the time of the assignment" (citing *Holloway v. Depositors Nat'l Bank*, 211 N.C. 227, 234 (1937))). Regardless of this conundrum, even if a claim passed to the Estate, Plaintiffs fail to satisfy the Court that the claim was properly assigned to the Trust.

45. The assignment from the Estate to Plaintiffs states, "Assignor hereby transfers, assigns and conveys unto the Assignee" "[a]ll of Assignor's *membership interest* in IOMAXIS, LLC[.]" (Compl. Ex. A (emphasis added).) There is no mention

of a separate tort claim, and the Court will not imply one.  *See Sony Ericsson Mobile Commc'ns. United States v. Agere Sys.*, 195 N.C. App. 577, 579 (2009) ("The best evidence of what parties to a written agreement intend is what they say in their writing[.]" (citation omitted)).  The operating agreement[8] defines the membership interest that passed to the Estate as only an economic interest.  (Compl. Ex. C, at Art. IX § 1.9 (limiting an estate's interest at a member's death to those listed in Art. VIII § 1.4: "to receive and be credited or debited with its proportionate share of Profits, Losses, Gains from Capital Transactions, Company Cash Flow, Company Sales Proceeds, Company Refinancing Proceeds, and Distributions in liquidation.").)  The assignment from the Estate to Plaintiffs therefore failed to include any tort claims Howard may have had while he was living.

46.    Plaintiffs subsequently filed, with the Court's permission, a "Confirmation of Assignment of Membership Interest in IOMAXIS, LLC" wherein the Estate agreed with Plaintiffs that the Estate intended to, and did, transfer "all of Decedent's rights, privileges, claims and causes of action passing through his Estate under his Last Will and Testament to Assignees, as Trustees of the Trust, including all pre- and post-death claims connected and appurtenant to said ownership in IOMAXIS, LLC, whether in contract, tort, law, equity, or otherwise."  (ECF No. 154.1.)  However, such a "confirmation," attempting after the fact to expand the definition of "membership interest" to include "all pre- and post-death claims connected and appurtenant to said ownership" does not itself constitute the valid

---

[8] The Court accepts as true for purposes of this Motion Plaintiffs' allegation that IOMAXIS is properly a North Carolina LLC.  (Compl. ¶¶ 21, 76.)

assignment of a tort claim. Moreover, to the extent the "confirmation" is intended to be an affidavit regarding the Executor's intention at the time of the original assignment, it is unsworn and, therefore, not competent testimony. Even if it were competent, the language of the assignment at issue is unambiguous, leaving no room for the Court to consider extrinsic evidence of the Executor's intent.[9] *See, e.g., Root v. Allstate Ins. Co.*, 272 N.C. 580, 583 (1968) ("It is a well-recognized principle of construction that when the language of a contract is clear and unambiguous, the court must interpret the contract as written[.]").

47. Thus, the Court determines that any fraud claim against Defendants that Decedent Howard may have held during his lifetime did not transfer to Plaintiffs by assignment. The Court concludes, therefore, that Plaintiffs' first claim for fraud is futile as alleged, and Plaintiffs' Motion as to this fraud claim is **DENIED.**

## 2. Fraud Based on An Alleged Scheme to Siphon Funds

48. Plaintiffs assert a second fraud claim against IOMAXIS, Buhr, Spade, Burleson, and Griffin. (Pls.' Proposed Am. ¶ 202.) Specifically, the claim involves a telephone call in July 2020 during which Buhr allegedly discussed a scheme to siphon funds out of IOMAXIS and into shell entities. (*See* Pls.' Proposed Am. ¶ 202.) Unlike

---

[9] Absent another provision in the operating agreement, the default rule in North Carolina is that only a member's economic interest passes to the estate upon that member's death, N.C.G.S. § 57D-3-02(b) (stating that the member's "estate . . . will automatically become an economic interest owner entitled only to the economic interest attributable to the [member's] ownership interest"), and the subsequent transfer of the economic interest may not be expanded to give the assignee membership rights, N.C.G.S. § 57D-5-02 ("The transfer of an economic interest or portion thereof does not entitle the transferee to become or exercise any rights of a member other than to receive the economic interest or the portion thereof assigned to the transferee."). The IOMAXIS operating agreement does not override this default rule.

Plaintiffs' first fraud claim, which involved alleged conduct before Decedent Howard's death, the second fraud claim involves alleged conduct after Decedent Howard's death and after Plaintiffs held the economic interest rights. Consequently, unlike the first fraud claim, Plaintiffs clearly have standing to assert this second claim for fraudulent concealment. However, the IOMAXIS Defendants contend that the Court should not permit amendment to add this claim because it is futile. The Court disagrees.

49. "[F]raudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity." *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at \*9 (N.C. Super. Ct. June 18, 2007) (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)). Plaintiffs must plead:

> (1) the relationship [between the plaintiff and defendant] giving rise to the duty to speak, (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what [the defendant] gained by withholding information, (6) why [the] plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

*Breeden*, 171 F.R.D. at 195 (adopted by *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at \*10).

50. Defendants contend that the proposed claim is futile because Plaintiffs failed to allege a duty to disclose. (Defs.' Br. Opp'n Pls.' Mot. 16.) A duty to disclose arises when: (1) "a fiduciary relationship exists between the parties to the transaction"; (2) "a party has taken affirmative steps to conceal material facts from the other"; or (3) "one party has knowledge of a latent defect in the subject matter of

the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *38–39 (N.C. Super. Ct. Apr. 20, 2018) (quoting *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009)).

51. The Court concludes that Plaintiffs have pled sufficient facts to establish a duty to disclose the alleged July 2020 plan to misappropriate funds. First, Plaintiffs have alleged that Buhr purposefully kept this information from Plaintiffs so that Plaintiffs would not be able to reach IOMAXIS' assets. (*See, e.g.*, Pls.' Proposed Am. ¶¶ 187, 203.) Second, Plaintiffs have alleged that all Defendants against whom this claim is asserted had knowledge of the plan, knew that Plaintiffs were unaware of it, and concealed it from Plaintiffs. (*See, e.g.*, Pls.' Proposed Am. ¶¶ 192, 204.) Finally, given Plaintiffs' restricted access to financial records as an economic interest holder, coupled with Defendants' steadfast objections to providing financial information regarding Fast Rabbit and Global Vector in discovery, Plaintiffs could not have discovered such a plan through reasonable diligence.[10] *See Herrera*, 2018 NCBC LEXIS 35, at *39.

---

[10] A review of the proposed amended pleading as a whole satisfies the Court that the reasonable reliance element has also been sufficiently pled. While "[r]eliance 'is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate[,]'" *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *110 (N.C. Super. Ct. Dec. 31, 2019) (quoting *Cobb v. Pa. Life. Ins. Co.*, 215 N.C. App. 268, 277 (2011)), Plaintiffs have alleged that they tried to investigate but Defendants objected to those efforts during discovery in this case, (*see, e.g.*, Pls.' Proposed Am. ¶¶ 171–72). Moreover, Plaintiffs' status as economic interest holders has prevented them from being able to use the tools available to a member to investigate their concerns. (*See, e.g.*, Pls.' Proposed Am. ¶ 203.) Thus, the Court concludes that Plaintiffs have sufficiently alleged reasonable reliance on Defendants' omission to assert a claim for fraud.

52.     Defendants also contend that Plaintiffs do not allege that Defendants actually made good on the alleged scheme and transferred funds from IOMAXIS to shell companies. (Defs.' Br. Opp'n Pls.' Mot. 16.) However, under *Breeden*, Plaintiffs are not required to allege that the scheme was actually carried out in order to state a claim for fraudulent concealment. *See Breeden*, 171 F.R.D. at 195. Rather, it is sufficient that Plaintiffs have alleged that Buhr devised this scheme in order to keep IOMAXIS funds out of Plaintiffs' hands and then communicated this plan to the remaining Defendants, each of whom failed to inform Plaintiffs while under a duty to disclose this information, and that damage resulted. Here, Plaintiffs allege that, at a minimum, these actions on the part of Defendants have increased the costs involved in their efforts to file a federal tax return for the Howard Estate and to determine amounts the Trust may be due. (Pls.' Proposed Am. ¶ 206.)

53.     Similarly, the Court is unconvinced by Defendants' contention that Plaintiffs have failed to allege that the concealed information was material because they did not specifically allege that money actually moved out of IOMAXIS. (Defs.' Br. Opp'n Pls.' Mot. 17.) Plaintiffs have alleged that, at the time this call took place, Plaintiffs were "actively discussing the preparation of a new Case Management Order to be submitted to the Court, were scheduling depositions, and were also discussing certain discovery issues including, without limitation, IOMAXIS'[s] objections to Plaintiffs' seeking of information concerning Fast Rabbit and other entities." (Pls.' Proposed Am. ¶ 190; *see also* Pls.' Proposed Am. ¶¶ 189, 191.) Had Plaintiffs known of Buhr's alleged scheme to move money, whether it was actually moved out of

IOMAXIS or not, it undoubtedly would have influenced their actions. *See Shaw v. Gee*, 2016 NCBC LEXIS 103, at \*11 (N.C. Super. Ct. Dec. 21, 2016) ("A fact is material if, had it been known to the party, it would have influenced the party's judgment or decision[.]" (citation omitted)).

54. The Court determines that Plaintiffs have adequately alleged a claim under Rule 9(b) to proceed to discovery. Therefore, Plaintiffs' Motion is **GRANTED** as to the post-assignment fraud claim.

### 3. UVTA

55. Plaintiffs allege their UVTA claim against IOMAXIS, Buhr, Griffin, Spade, and Burleson based on a "plan to transfer . . . assets of IOMAXIS to themselves, other persons, and/or holding companies controlled by one or more of the aforementioned individual Defendants." (Pls.' Proposed Am. ¶ 213.) Plaintiffs further allege that these parties "devised and carried out this plan in a concealed manner for the stated purpose of keeping assets out of reach of Plaintiffs[.]" (Pls.' Proposed Am. ¶ 214.) Finally, Plaintiffs allege that "even prior to the July 2020 'plan' detailed . . ., Defendants caused other assets of IOMAXIS to be improperly transferred out of IOMAXIS and into affiliated entities such as Fast Rabbit and Global Vector." (Pls.' Proposed Am. ¶ 217.)

56. Defendants contend that Plaintiffs did not adequately allege that a transfer actually took place as a result of the July 2020 call. They further contend that Plaintiffs have failed to "explain these [prior-to-July 2020] transactions with any specificity or allege when they occurred." (Defs.' Br. Opp'n Pls.' Mot. 17–18.)

57. The Court agrees with Defendants that Plaintiffs' pleading with respect to alleged transfers that took place prior to the July 2020 call is too thin. Although Plaintiffs attempt to explain some of the vagaries of their pleading by pointing to IOMAXIS' objections and refusal to answer their discovery requests, this explanation only goes so far. Even under a notice pleading standard, Plaintiffs' allegation regarding the alleged "prior" transfers of "assets" into "affiliated entities" is devoid of the most basic information necessary to state a claim.

58. On the other hand, Plaintiffs have alleged the specific facts pertaining to the July 2020 scheme necessary to state a claim, including when the call occurred, the contents of the scheme, who made and heard the plan, the goal in creating the plan and sharing it with the other Defendants, and how the scheme has harmed Plaintiffs. (Pls.' Proposed Am. ¶¶ 186–92.) Furthermore, while Plaintiffs have alleged broadly that the scheme was "carried out" without providing further detail, the Court is satisfied, given Plaintiffs' limited knowledge and access to information, that Plaintiffs have adequately alleged a claim under the UVTA. *See* N.C.G.S. § 39-23.1(12) (defining "transfer" as every mode "of disposing of or parting with an asset or an interest in an asset").[11]

---

[11] Defendants separately contend that Plaintiffs' UVTA claim is barred by the statute of repose to the extent it relates to transactions occurring prior to March 2017. (Defs.' Br. Opp'n Pls.' Mot. 18); *see* N.C.G.S. § 39-23.9(1) (providing that a claim for relief under the UVTA must be brought within "four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant" if it is alleged that the debtor made the transfer with intent to hinder, delay, or defraud its creditor). Because the Court allows Plaintiffs to add their UVTA only as to the July 2020 call, the Court does not decide this issue for purposes of this Order and Opinion.

59. Therefore, Plaintiffs' Motion is **GRANTED** only as to transfers that resulted from the alleged scheme discussed during the July 2020 telephone conference.

### 4. **UDTPA**

60. Plaintiffs' UDTPA claim alleges that "[a]mong other things and without limitation, Defendant IOMAXIS . . . and its individual Defendant-Members caused at least $1.5 million of IOMAXIS funds to be transferred to Fast Rabbit, at which point Fast Rabbit allowed for the use of such funds for the personal benefit of select IOMAXIS and Fast Rabbit members with the knowledge of both IOMAXIS and Fast Rabbit." (Pls.' Proposed Am. ¶ 223.) Defendants contend that such allegations do not allege conduct "in or affecting commerce" as required under a UDTPA claim. (Defs.' Br. Opp'n Mot. 19.)

61. "N.C.G.S. § 75-1.1 declares unlawful '[u]nfair methods of competition in or affecting commerce.' " *Bhatti v. Buckland*, 328 N.C. 240, 243 (1991) (quoting N.C.G.S. § 75-1.1(a)). With the exception of professional services rendered by a learned professional, "commerce" is broadly defined to include "all business activities, however denominated[.]" N.C.G.S. § 75-1.1(b). However, "the [UDTPA] is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593 (1991). Specifically, "[m]atters of internal corporate management . . . do not affect commerce as defined by Chapter 75 and our Supreme Court." *McKee v. James*, 2014 NCBC LEXIS 74, at *40–41 (N.C. Super. Ct. Dec. 31, 2014) (quoting *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App.

355, 358 (2003)); *see Dodge v. Appalachian Energy, LLC*, 2021 NCBC LEXIS 52, at *15 (N.C. Super. Ct. May 27, 2021) (dismissing a UDTPA claim as an intracompany dispute where the complaint alleged that the defendants "breached the operating agreement, concealed company information, misused company assets, and wrongfully increased their interests at the expense of other members"); *JS Real Est. Invs. LLC v. Gee Real Est., LLC*, 2017 NCBC LEXIS 104, at *21 (N.C. Super. Ct. Nov. 9, 2017) (stating that "tangential involvement" of third parties does not "trigger liability" under the UDTPA); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *15 (N.C. Super. Ct. Mar. 27, 2018) (noting that the involvement of third parties does not "change the fundamental character of the dispute" when the "unfairness of [the] actions, if any, inheres in the relationship between" the co-owners of the business (citation omitted)).

62.    While the caselaw with respect to intracompany and intercompany disputes can be confusing, the distinction lies in the nature of the second entity's involvement with the first.  If the harm is *to* the second entity or to the flow of commerce *between* the first and second entities, commerce is impacted.  However, if the second entity is used merely as an instrument or "shell" to facilitate harm *within* the first entity, the dispute is intracorporate, and the UDTPA is not implicated.  *See, e.g.*, *JS Real Est. Invs. LLC*, 2017 NCBC LEXIS 104, at *21.

63.    Factually, this case falls into the latter category.  Indeed, Plaintiffs repeatedly refer to Fast Rabbit and Global Vector as "affiliates" of IOMAXIS because of overlapping ownership interests.  (Pls.' Proposed Am. ¶¶ 135, 176.)  In addition, Plaintiffs contend that Fast Rabbit and Global Vector were "shell" entities that served

no commercial purpose. (Pls.' Proposed Am. ¶¶ 117–18, 158–60, 168–70, 177–78, 183–85.) While Fast Rabbit and Global Vector are the tools with which Defendants allegedly carried out their improper transfers, the economic interest harmed is completely within IOMAXIS. Therefore, on this point, Plaintiffs have not alleged facts "in or affecting commerce." N.C.G.S. § 75-1.1(a). *See Potts*, 2018 NCBC LEXIS 24, at *15–16 (dismissing the UDTPA claim even when the defendant "carried out his mismanagement and misappropriation of [the company's] assets by channeling money and equipment" to another company because "the unfairness occurred in the interaction between the company's owners and directors"). Accordingly, the claim fails on futility grounds, and Plaintiffs' Motion with respect to this claim is **DENIED**.

### 5. Constructive Trust

64. Finally, as Plaintiffs' counsel acknowledged during the hearing, (Tr. 102:3–6), the constructive trust claim is not a claim at all but is rather a request for relief. *See LLG-NRMH, LLC v. N. Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *14 (N.C. Super. Ct. Oct. 9, 2018) ("[A] constructive trust is not a standalone claim for relief or cause of action." (citing *Weatherford v. Keenan*, 128 N.C. App. 178, 179 (1997))); *see Flynn v. Pierce*, 2020 NCBC LEXIS 149, at *15 (N.C. Super. Ct. Dec. 22, 2020) (dismissing a claim for constructive trust as a remedy rather than a claim). Therefore, Plaintiffs' request to add this "claim" is **DENIED** without prejudice to Plaintiffs' ability to pursue the equitable remedy of a constructive trust to the extent their surviving claims justify such a remedy. *See LLG-NRMH, LLC*, 2018 NCBC LEXIS 105, at *14.

65.     In sum, the Court, in its discretion, **DENIES** Plaintiffs' Motion to Amend as to Plaintiffs' proposed Fourth Claim for Relief, Plaintiffs' claim under the UVTA to the extent it involves alleged transfers that occurred before and not as a result of the alleged scheme discussed during the July 2020 telephone conference, Plaintiffs' UDTPA claim, and Plaintiffs' claim for imposition of a constructive trust.

66.     On the other hand, the Court, in its discretion, **GRANTS** Plaintiffs' Motion to Amend as to Plaintiffs' proposed Fifth Claim for Relief, and Plaintiffs' claim under the UVTA to the extent it involves alleged transfers that resulted from the alleged scheme discussed during the July 2020 telephone conference.

**B.     Hurysh's Motion to Amend**

67.     Hurysh's proposed amendment seeks not only to change his responses to the allegations of Plaintiffs' Complaint but also to add cross-claims against his co-defendants, as well as claims against new parties Fast Rabbit and Global Vector. With respect to the additional claims, Hurysh's Motion requests that this Court permit him to expand the litigation to allow thirteen new claims asserted variously against the existing defendants and two of the three new parties named by Plaintiffs, Fast Rabbit and Global Vector. (*See generally* Hurysh's Proposed Am.)

68.     After careful review of all materials relevant to Hurysh's Motion to Amend, the Court, in its discretion, **GRANTS** the Motion to the extent Hurysh amends his responses to the Plaintiffs' allegations against him, but the Court **DENIES** the Motion to the extent Hurysh seeks affirmative relief by way of cross-claims or impleader.

69.     Several considerations lead the Court to this conclusion.  The gravamen of this case involves Plaintiffs' rights as 51% economic interest holders in IOMAXIS following Howard's death in June 2017.  Hurysh's rights as a minority member and, until very recently, an employee of IOMAXIS, and his rights as a member of the now-dissolved entities Fast Rabbit and Global Vector, are separate questions that depend on different facts.

70.     Indeed, the crux of Hurysh's claims does not involve the Howard Interest at all.  The claims Hurysh seeks to add involve alleged harm to him personally or harm to IOMAXIS, Fast Rabbit, and Global Vector.[12]  While the facts supporting Hurysh's derivative claims on behalf of IOMAXIS might also have relevance, to some degree, on Plaintiffs' claim for distributions, Hurysh's proposed claims focus on the value of IOMAXIS as a whole rather than on the Plaintiffs' specific economic interest.  Moreover, the trier of fact on Hurysh's claims would have to tease out, among other things, the role Hurysh played, if any, in the decisions he now criticizes.  They would have to allow for any financial benefit he may have received from them.[13]  Further complicating the matter is the fact that the IOMAXIS Defendants now contend that Hurysh was motivated to change his position in this case at this juncture because they refused to accede to his demand for additional financial benefit from IOMAXIS.  (*See* Aff. Brad C. Buhr ¶ 9, ECF No. 112.2.)

---

[12] Defendants contend that Hurysh's derivative demands did not satisfy statutory requirements, implicating his standing to sue and potentially making the proposed claims futile. (Defs.' Br. Opp'n Hurysh's Mot. 17.)  The Court does not reach these issues.

[13] Hurysh testified that he received a portion of the 2013 loan proceeds. (Hurysh Aff. ¶ 64.)

71.     In short, Hurysh's proposed claims seek to expand the scope of this litigation and would involve facts and circumstances ranging far wider than the dispute that is presently before the Court.[14]  The Court is mindful of the undue prejudice allowing such an amendment would cause the remaining parties in this case, as they would be delayed in the progression of the case by further discovery, motion practice, and a jury trial on issues largely unrelated to Plaintiffs' claims.  *See Window World of St. Louis, Inc.*, 2015 NCBC LEXIS 79, at \*18 (stating that the Court may deny a motion to amend where such amendment would result in undue prejudice).  Under the circumstances, the Court, in its discretion, **DENIES** Hurysh's Motion to Amend to add claims.

72.     However, the Court, in its discretion, **GRANTS** Hurysh's Motion to the extent he seeks to amend his responses to Plaintiffs' allegations against him, without the addition of affirmative claims.  Hurysh contends that "[a]lthough he did not understand it at the time, the original answer was not designed to protect [his] rights[.]" (Hurysh Br. Supp. Mot. Amend 6.)  He has now changed counsel.  (Ord. Consent Mot. Withdraw & Substitute Counsel, ECF No. 76.)  The Court has reviewed Hurysh's proposed changes to his answer and determines that allowing them will not unduly expand the scope of this case.  The Court therefore concludes that Hurysh shall be allowed to amend his answer and affirmative defenses as he has proposed without adding affirmative claims.

---

[14] The Court also notes that Hurysh is presently involved in two suits related to his involvement and interest in IOMAXIS before the Maryland and Virginia courts. (*See* Hurysh Br. Supp. Mot. Amend 5 (describing the Maryland and Virginia lawsuits).)

## V. CONCLUSION

73. WHEREFORE, the Court, in its discretion, hereby ORDERS as follows:

   a. Plaintiffs Motion to Amend is **GRANTED in part** and **DENIED in part**. Plaintiffs are permitted to file a first amended complaint, in form and content consistent with the conclusions and rulings set forth in this Order and Opinion, no later than ten (10) days from the entry of this Order.

   b. Hurysh's Motion to Amend is **GRANTED in part** and **DENIED in part**. Hurysh is permitted to file an amended answer, in form and content consistent with the conclusions and rulings set forth in this Order and Opinion, no later than ten (10) days from the entry of this Order and Opinion.

   c. The parties shall meet and confer and submit a new Case Management Report to the Court pursuant to Business Court Rule 9 by 5:00 P.M. on or before 14 January 2022.

IT IS SO ORDERED, this the 22nd day of December, 2021.

/s/ Julianna Theall Earp
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases